This is an action brought by plaintiffs against defendants to recover $57,035 as a special deposit and trust fund. The action was originally brought against the North Carolina Bank and Trust Company subsequently Gurney P. Hood, Commissioner of Banks, was made a defendant. The defendants deny that the fund was a special deposit and trust fund, but the transaction was one of debtor and creditor.
It was admitted by the defendants that their only purpose was to have the court determine whether the plaintiffs had a priority over the general depositors of the bank to the extent of $57,035.00, and it was agreed that demand was made by the plaintiffs upon Gurney P. Hood, Commissioner of Banks, for the preferential payment of the sum of $57,035, and that the payment was refused by the said Commissioner of Banks.
On motion of plaintiffs, an order to show cause and restraining order was made on 25 April, 1933, by Judge Devin, to segregate and to hold separate and apart from its other assets, the sum of $57,035 in cash. This matter was heard by Judge Sinclair, 17 May, 1933, who found certain facts and ordered that the $57,035 be segregated to wit: "$57,035, be and the same is hereby ordered by the court to be by the defendant placed in a safety-deposit box in the North Carolina Bank and Trust Company, at Wilmington, N.C. and there held, intact, until the final determination of this action or some other order is made relative to its safe-keeping, and when so deposited in such safety-deposit box, the defendant North Carolina Bank and Trust Company shall lock said box and furnish a key thereto to E. K. Bryan, of counsel for the plaintiffs, and the bank shall keep one key, and neither the bank nor its officers, nor the said Bryan, shall open said box where the *Page 129 
money is so deposited except in the presence of a representative of said bank and a representative of the plaintiffs."
I.C. Wright, one of plaintiff's witnesses testified on direct examination as follows "I am a practicing lawyer in the city of Wilmington, N.C. and was one of the attorneys who brought suit against the American Surety Company attempting to recover $135,000. We sued for more than that, but only recovered $57,035. This amount was paid by Mr. John D. Bellamy, of counsel for the American Surety Company, who brought to me as one of the counsel for the plaintiffs, two drafts drawn by the American Surety Company, payable at the Chase National Bank, New York, aggregating that sum. One of them was payable to the board of county commissioners of Brunswick and one to the board of education of Brunswick. These drafts were delivered to me in the courthouse in Wilmington.
The first thing that I did was to have Mr. Bellamy correct the checks by making it appear thereon that these payments did not include the costs of the action. I then notified Bryan and Campbell and we called Mr. Ruark, county attorney, at Southport, and other counsel for the plaintiffs and told them that we had the checks and requested that he have some one come up and endorse the checks to send them on for payment. In consequence of that conversation, Mr. Joe Ruark and R. I. Mintz, clerk to the board of county commissioners, and Mr. Sentelle, clerk to the board of education, came to Wilmington and met with me and Mr. Campbell in Bryan and Campbell's office. In the office of Bryan and Campbell we had a discussion as to how the checks would be handled and after we had the discussion we called Mr. Yates, vice-president of the North Carolina Bank and Trust Company, and he came up to the office and we told him the conversation and the discussion we had just had. I told him most of it and Mr. W. B. Campbell told him the balance. These gentlemen said that they did not feel that they had the power and authority to endorse those checks to us lawyers."
Mr. Royall: "Was Mr. Yates present?" A. "We told Mr. Yates of this conversation. We told Mr. Yates that we had these drafts for collection and that we had had a discussion with these gentlemen, and these two clerks to the respective boards did not feel that they could endorse the checks except to the Peoples United Bank, which was the county depository, and we lawyers did not want to turn the drafts over until our fees were paid out of the money and that we had agreed among ourselves, that the Peoples United Bank was willing for the drafts to be sent on through the North Carolina Bank and Trust Company and that the North Carolina Bank and Trust Company would hold that just like Mr. Campbell and I had sent it on for collection ourselves and we told *Page 130 
him that we did not want to mix it with our funds but to keep it apart from other funds and send them for collection and when collected we were going to take the money and meet with the commissioners and agree on our fees and for the board of education and board of commissioners to be paid the balance due them.
Some of us asked if we could take that $57,000 down to Southport and deliver it and we said we would if they didn't come to get it or agree for some other way. I asked Mr. Yates the question if he or the North Carolina Bank and Trust Company would be willing to handle these drafts for collection under that agreement and he said that it could be done with the permission of the Peoples United Bank and he pointed to Mr. Joe Ruark and said `there sits the president, and if he agrees to it we will.' Mr. Ruark said he agreed to it and that was what he wanted done, and I said I don't like the proposition of the money going in some one else's name until it is paid in and until it is distributed, and Mr. Yates said he would send it for collection and hold it in a separate account until we agreed and notified them and thereupon the checks were signed and endorsed by Mr. Mintz for the board of commissioners and Mr. Sentelle for the board of education and Mr. Ruark for the Peoples United Bank, and they were turned over to Mr. Yates. The checks never went to Southport except for endorsement in that office. It was agreed that it should not be done, but be held by this bank.
It was agreed that the bank would distribute the funds if the drafts were collected according to the agreement. This was done on 20 February of this year. The checks were delivered to Mr. Yates in Bryan and Campbell's office in the North Carolina Bank Building and the meeting broke up. Mr. Yates did not give me any paper-writing about the two checks.
Mr. Mintz and Mr. Sentelle stated that they would go down stairs to the bank afterwards as they wanted a memorandum of the checks they had endorsed to carry back with them. I had a further conversation or agreement with Mr. Yates about these checks. I wanted to know whether the checks had been paid or not and he advised me that the drafts had been collected. This was a verbal communication. I was in and out of the bank every day. On the first Monday of March, following that meeting, my recollection is that it was 6 March, Mr. Campbell and I went to Southport and had a meeting with the board of commissioners and board of education in an effort to agree about our fees. We did not agree at that time on the fees or how this money should be distributed, so on the next day, 7 March, when we came back, we wrote a letter to the bank. I have not got it here. They notified them to produce it." *Page 131 
Mr. Royall: "We make no point of using the copy. This is a copy of the letter. Mr. Campbell and I went down and put it on Mr. Yates' desk. He was not there at the time. This was 7 March, 1933."
Plaintiffs offer in evidence letter dated 7 March, 1933, as follows:
"7 March, 1933.
North Carolina Bank and Trust Company, Wilmington, North Carolina. Gentlemen:
You will recall that on 20 February, 1933, we and the representatives of the Brunswick County commissioners and board of education delivered to you checks on New York totaling $57,035 to be collected and held on special deposit, in trust, until we could settle with the board of county commissioners and the board of education and receive our shares of that money.
When the items were so handled it was anticipated that the settlement of the interested parties would be completed by this time. Such settlement not having been made, you are hereby so advised and notified to continue to hold separate, on special deposit, in trust, those funds until we get our part of them and so advise you. Yours very truly, Bryan Campbell, J. W. Ruark, C. Ed. Taylor, I.C. Wright."
"I had a further conversation with Mr. Yates, in which I asked him whether the money had been segregated and was held separate and apart from other funds, and he told me that it was not; I told him that we wanted that done. Mr. Yates said that the checks had been collected and deposited to the credit of the bank by its New York correspondent, the Chase National Bank; that it had transferred the money to another bank, which he told me at the time. I told him to write that bank to have the money as a special fund until this matter was determined. He did not say that he would or would not. In the meantime Mr. Bellamy had paid the costs. Mr. Yates mentioned that he got a check for $1.00 as a witness fee in the same case and he hoped that we would get the money because he said it was a special fund set apart for a specific purpose. I did not have any further conversation with Mr. Yates, except I asked him whether he wrote the bank to have the money set apart and he said he did not. There is another thing in the pleadings, if you want to ask about it.
I had a note at the bank that I owed them for a balance of $1,100 with Dr. Murphy as a signer with me. It was a collateral note and Dr. Murphy had died and before that first Monday, Mr. J. V. Grainger, vice-chairman of the board of directors of the bank, asked me if that *Page 132 
was my note or if it was Dr. Murphy's note. This was before we had agreed on our settlement with the commissioners and between 20th of February and the 13th of March. I told him it was my note, that Dr. Murphy was endorsing it and that I owed the note. The bank was executor of Dr. Murphy's estate and the family had requested and the bank acquiesced that I be attorney for the estate. Mr. Grainger said: `I am glad it is yours.' I told him I was going to pay the note out of my fee in this matter.
Two or three days before the note came up for payment or renewal I said I did not know how I was going to arrange about this note. I intended to pay it out of this fee. Mr. Grainger said that Mr. Strange had been handling the matter as trust officer and he could sign the note as executor of the estate and just renew it. On the 13th, I got a renewal note, collateral note, and signed it and wrote my check for the interest and wrote the assignment for this fund. I have that assignment, I think. The assignment was delivered to Mr. Strange, trust officer of the North Carolina Bank and Trust Company, at the time I carried the renewal in. I told him that I intended to pay it out of this fund and we had not agreed on our fees and he could take it if he wanted it and he took my new note and this assignment, with the statement, `I will see about it. Usually they want all the security and collateral they can get.' I gave my check for the interest and my old note came back marked `renewed.'"
Plaintiff offers in evidence assignment dated 19 March, 1933, amount $1,100, signed I.C. Wright, produced by defendants under notice, marked Exhibit B, reading as follows:
"$1,100.
I hereby transfer and assign to the North Carolina Bank and Trust Company, as collateral security to my note of this date for that amount, eleven hundred dollars ($1,100) of the special deposit held in trust by the North Carolina Bank and Trust Company in the name of the Peoples United Bank of Southport, for $57,035, more than that part of the fund belonging to me.
This 13 March, 1933. I.C. Wright."
Defendants object to the introduction of the foregoing document; objection overruled; defendants except.
"I know M. F. Allen, who was cashier for the North Carolina Bank and Trust Company, at Wilmington."
Plaintiffs offer in evidence letter from M. F. Allen to Peoples United Bank, dated 21 March, 1933, marked Exhibit C, as follows: *Page 133 
"North Carolina Bank and Trust Company Wilmington, N.C. 21 March, 1933.
Peoples United Bank, Southport, N.C. Gentlemen:
We don't think we had the right to charge against special account set up in your name a part of the currency we shipped you on 3 March, amounting to $3,802.40. We are, therefore, charging your regular account with this amount and crediting the same to its original figures.
 Trusting this meets with your approval, we are Yours truly, M. F. Allen, cashier."
To the introduction of the foregoing letter, the defendants object, but not to the genuineness of the signature. Objection overruled and defendants except.
"I told Mr. Yates that Mr. Ruark had stated that the North Carolina Bank and Trust Company was correspondent bank in Wilmington for the Peoples United Bank, and so it could be handled by the North Carolina Bank, and that was why we sent for him. Mr. Ruark was president of the Peoples United Bank."
The affidavit of I.C. Wright, corroborative, was in part: "and turned over to Mr. Yates for collection, and he was to hold the money in a special deposit and for this specific purpose of being apportioned out as we agreed with the commissioners and board of education. I left and came back to my office."
On cross-examination: "Q. Don't you know that those funds, as soon as collected, on 23 September, were deposited the next day in the Peoples United Bank and credited to them by the North Carolina Bank and Trust Company? A. As a special account, or special deposit, which was to be done, and he agreed that it was to be held, subject to our agreement as to how it was to be distributed. That was by special agreement with Mr. Ruark, president, that they should be under that agreement. . . . Banking holidays were being declared in Michigan and a great many states and that was one reason that we were so particular about wanting these things collected and wanted the actual cash held separate and I was not willing for that money to be deposited in the North Carolina Bank and Trust Company and wanted to send these checks for collection, as I always do for clients. . . . I had a conversation with Mr. Yates, in which he said: `I want the Brunswick folks to have that money, and hope that they will get it, for it certainly was a special account for a specific purpose.' This conversation took place when I went down to see if that money had been put in a special fund, if the cash had been segregated in the bank records." *Page 134 
The testimony of I.C. Wright was in all material aspects corroborated by W.B. Campbell, R.I. Mintz, J.W. Ruark.
W.B. Campbell testified in part: "After we conferred among ourselves I telephoned Mr. Yates requesting him to come to my office if he could, that I wanted to take up with him the matter of handling the vouchers. In a few minutes he came and I stated to him that we had these two drafts, drawn by the American Surety Company on itself and payable through the Chase National Bank. That we wanted the drafts collected and that we would have to settle with clients and that our compensation had not been fixed and that division would have to be determined by agreement between counsel and clients and we wanted them put in a special deposit for collection and when collected held until an agreement could be reached, for distribution, according to the interests then ascertained, and that no one interested would be permitted in the meantime to check on this fund, which was an aggregate of the two drafts.
We explained in detail to Mr. Yates that as attorneys we had nothing but two drafts and no fees and we would not release control of the money when collected until settlement of respective interests had been ascertained and it was then to be distributed as reported to the bank. We also stated to him that when these collections were made it was to be held separate and apart from any of the funds of any of the parties, and that we were expecting to reach an agreement fixing the interest of clients. . . . The vouchers were then endorsed and delivered to Mr. Yates in my office under that agreement. That was about 1:30 in the day and we were all anxious to get them started on that course during that banking day. The drafts were delivered under these agreements to Mr. Yates in person."
L. T. Yaskell, chairman of board of commissioners of Brunswick County testified in part: "This transaction took place in February, 1933. I know Mr. M. F. Allen when I see him; I saw him in the court room this morning; he was an officer and employee of the North Carolina Bank and Trust Company. Q. After this controversy arose did you have any conversation with Mr. Allen, and if so, detail it to the court and jury, in reference to this fund? (Defendants object.) Q. (By court): Before the suit was brought? A. Yes, sir. My conversation was before the suit was brought. Objection overruled; defendants except. I called Mr. Allen over the telephone and asked Mr. Allen the status of the funds, the $57,000 belonging to the funds of Brunswick County. (Defendants object; objection overruled; defendants except.) I spoke to Mr. Allen in reference to the 5 per cent they were going to pay out and Mr. Allen said he did not know the status of that fund, for the reason that the fund was placed there for a special *Page 135 
fund and I would have to talk to Mr. Yates. His understanding was that this fund was not to be disturbed, was placed there for a special purpose. I told him that I was chairman of the board, and he said it would be necessary to get a resolution of the board of commissioners and board of education in order to disturb the fund. (Defendants object to answer and move that it be stricken from the record; objection overruled; defendants except.) Q. State whether or not the attorneys were to be paid out of that fund? (Defendants object.) Q. Do you know? A. Yes, sir; I know. (Objection overruled; defendants except.) It was understood that the funds were not to be disturbed until the attorneys were paid out of it. (Defendants object to the foregoing answer and move that the answer be stricken out; objection overruled; defendants except.) The board of county commissioners were insisting that the attorneys were to be paid out of this fund and it was not to be disturbed until they were. (Defendants object to answer and move to strike out; objection overruled; defendants except.) Cross-examination (by Mr. Royall). This conversation was on the morning that the bank went on the moratorium, or the day afterwards."
J. W. Yates, vice-president, North Carolina Bank and Trust Company (Wilmington unit) witness for defendants testified in part: "Q. State to his Honor and the jury the transaction, as you recall it, which took place, in reference to these drafts involved in this controversy? Mr. Royall: We are reserving our objection in regard to the competency in respect to the board of commissioners and board of education of Brunswick County. On 20 February, I received a telephone message from the office of Bryan and Campbell, asking me to come up and I did so and found in the office Mr. Campbell, Mr. I.C. Wright, Mr. J. W. Ruark, Mr. Mintz and Mr. Sentelle. They explained that they had two checks sent in settlement of some suit that the board of education and board of commissioners of Brunswick County had against the American Surety Company or somebody the American Surety Company had bonded, Mr. Inman. That they wanted to get money for these checks and send forward for collection.
I told them that we could not pay any money on the checks until they had been collected. They stated that the Peoples United Bank of Southport was county depository and for that reason it would be necessary for the checks to be sent through the Peoples United Bank but that they desired to avoid the loss of time of about two days for the checks to go to Southport and back. Mr. Ruark in addition to being attorney was also president of the Peoples United Bank. I suggested that in my opinion Mr. Ruark could endorse these checks in behalf of the bank and that they could be turned over to the North Carolina Bank and Trust Company for collection. It was only necessary for the chairman *Page 136 
of the board of commissioners or clerk to the board of education to endorse them and turn them over to me as representative of the North Carolina Bank and Trust Company. They stated further that the lawyers present had an interest in the amount, in the way of fees, the amount of which had not been decided, but which would be decided in a short time, and they wanted the proceeds of these checks to be kept and credited in a separate and distinct account from the regular and general account of the Peoples United Bank. The Peoples United Bank was carrying at that time a general account with us. It was their wish that these funds be kept and credited in a separate account from the regular account. I suggested that the checks be forwarded for collection and when they had been collected and the bank had been so advised the amount be credited to the Peoples Bank of Southport, special account, and they all agreed that was satisfactory, and upon that basis, I took these checks. We were in the office probably a half hour and that was the substance of the conversation.
We started downstairs and I am under the impression that we all started downstairs, and I said going downstairs: `I will give you receipts for these checks.' I think they were all present at this time. They did not suggest that I give them receipts but I thought it was proper. I came downstairs and drew two receipts which were offered in evidence, delivered one to Mr. Mintz and one to Mr. Sentelle. It was my impression that Mr. Ruark was standing in the middle of the lobby at that time, if not at that moment, he had been a moment or so before. I was also under the impression that Mr. Campbell was there. We all came down together and I am not sure who came into the lobby of the bank and who passed on through and did not stop. I do know that Mr. Sentelle and Mr. Mintz were present. (Counsel hands witness paper-writing.) This is one of the receipts, check for $25,925. (Defendants offer receipt in evidence reading as follows): `20 February, 1933. Received from Peoples United Bank, Southport, North Carolina, depository of Brunswick County, North Carolina, a check for $25,925, drawn to the order of the board of commissioners, Brunswick County, North Carolina, on the Chase National Bank of New York, by the American Surety Company of New York.
When collected, the proceeds of this check are to be credited to the Peoples United Bank of Southport in a special account. N.C. Bank and Trust Company, J. W. Yates, vice-president.'
(Counsel hands witness another paper-writing.) This is the other receipt. Defendants offer same in evidence reading as follows: `20 February, 1933. Received from the Peoples United Bank, Southport, North Carolina, a check for $31,110, drawn to the order of the board of education, Brunswick County, North Carolina, on the Chase National Bank of New York, by the American Surety Company of New York. *Page 137 
When collected, the proceeds of this check are to be credited to the Peoples United Bank of Southport in a special account. N.C. Bank and Trust Company, J. W. Yates, vice-president.'
"Q. Did you have any conversation with Mr. Wright? A. I have had conversations with one or two of the attorneys since that, but I don't recall any specific conversations I had with any of them. I never made the statement to Mr. Wright that this was a special deposit but stated that it was a special account. I have the distinct desire that Brunswick County would get the money and also these attorneys, if you want to know my sympathies in the matter. That is where they lie. I would like to see all of the depositors get their money, the unsecured as well as the secured. I think there is a difference between sympathy and interest.
Cross-examination (by Mr. E. K. Bryan): I came up to the office of Bryan and Campbell and stated to Messrs. Bryan and Campbell that it was my understanding that the money was to be divided between the parties in interest when their respective interests were decided between them. I understood this at the time the checks were turned over. Q. (by E. K. Bryan): It was one of the reasons they were putting it there, was to keep it away from Brunswick County and other people until that was decided, and that was the reason it was done in that way? A. I heard them discussing it. I was informed that the attorneys had an interest in the funds which was to be paid out of the particular fund. The Peoples Bank had a general deposit account in the North Carolina Bank and Trust Company. We didn't distinguish in that account belonging to Brunswick County. It was stipulated that the $57,035 was not to go in the general account. It was understood that the funds in the special account would be disbursed by the Peoples United Bank of Southport and in accordance with an agreement to be reached at a later date by the parties in interest, to the lawyers and the board of education and the board of county commissioners and that it was not to be checked upon until that time and that the checks were to be drawn to settle these specific accounts in accordance with the agreements. This was understood at the time the checks were taken. . . . Recross-examination (by E. K. Bryan): I know that Mr. Allen had written a letter when he charged five per cent to this special account. At the time he wrote that letter he had probably talked to some of us in the bank about it and that was probably the reason he wrote it. I don't think the letter of Mr. Wright and others of 7 March was replied to. A copy was sent the Peoples United Bank. I suggested that as long as Mr. Ruark was president of the Peoples United Bank he could act in that capacity in endorsing the checks. This he did. I knew he was president of the bank and accepted his endorsement as such." *Page 138 
M. F. Allen testified in part: "(Counsel shows witness letter from M. F. Allen to Peoples United Bank, Exhibit C, of plaintiffs' exhibits.) On the date this letter was written, 21 March, 1933, the other superior officers of the bank, such as Mr. Grainger and Mr. Yates, spoke to me in reference to this charge that had been made against the special account. They all decided that I had better write this letter and I did so and made entries reversing the charges. I do not know whether before that time the bank had received a letter from Messrs. Bryan and Campbell and Ruark and Taylor, because it did not come to my desk.
I did know the contents of the letter in a general way. I do not recall any conversation with Mr. Yaskell. I don't remember that I ever made the statement to Mr. Yaskell that these funds involved in these drafts were to be distributed by the bank or to be held intact or were to be segregated. The shipment I sent the Peoples United Bank at Southport was a shipment of currency."
The court below charged the jury as follows: "Gentlemen of the jury, if you find the facts to be as testified to by all of the witnesses, it would be your duty to answer the issue Yes. Otherwise, you would answer it No." Thereafter the jury returned verdict answering the said issue Yes.
Upon the incoming of the verdict the defendants moved that the same be set aside and for a new trial for errors occurring during the trial and appearing in the record. Motion denied. Defendants except. Thereupon defendants moved for a judgment non obstante vere dicto. Motion overruled. Defendants except. Whereupon his Honor signed the judgment as set out in the record, to which judgment defendants except.
This cause coming on to be heard before his Honor, Henry A. Grady, judge presiding, and a jury, at the October Term, 1933, of the Superior Court of Onslow County, and being heard, and the following issue having been submitted to the jury, to wit: (see issue above).
And the jury having answered the said issue Yes, and it further appearing to the court that the $57,035 is now held in a safety-deposit box in said bank subject to the orders of the court in this cause.
It is now on motion of counsel for plaintiffs ordered, considered and adjudged, that the plaintiffs are entitled to a preferred claim against the assets of the North Carolina Bank and Trust Company in the sum of $57,035, to be paid in full and that same was held in trust for the plaintiffs by said bank and that the said $57,035 now in the safety-deposit box be delivered to plaintiffs in satisfaction of this judgment, and that the plaintiffs recover their costs. The defendant Gurney P. Hood, North Carolina Commissioner of Banks, will pay the costs of this action." *Page 139 
The defendants assigned errors to the exceptions before set forth and made other exceptions and assignments of error and appealed to the Supreme Court. The other necessary facts will be set forth in the opinion.
The defendants made motions in the court below for judgment as of nonsuit at the close of plaintiffs' evidence and at the close of all the evidence. C.S., 567. The motions were overruled and in this we can see no error.
The settled rule in this jurisdiction is that upon a motion as of nonsuit, the evidence, whether offered by the plaintiff or elicited from defendants' witnesses, is to be considered in the light most favorable to the plaintiff, and he is entitled to every reasonable intendment thereon and every reasonable inference to be drawn therefrom. We think the evidence sufficient to show that the fund was a special deposit and trust fund.
The evidence is set forth above rather lengthy, but the amount involved is large and the controversy important. The testimony of I.C. Wright, that was in all material aspects, corroborated by W. B. Campbell and other witnesses and plaintiffs' evidence was to the effect that: there were two drafts aggregating $57,035. "Check No. 40916 of Am. Surety Com. to Bd. of Com. of Bru. Co., N.C. $25,924. Check No. 40917 of same Co. date to Bd. of Ed. $31,110. Both signed by E. P. Watson, vice-pres. Chase National Bank, New York. 15 February, '33."
On 7 March, 1933, the following letter was written to North Carolina Bank and Trust Company at Wilmington, N.C. by Bryan and Campbell, J. W. Ruark, C. Ed. Taylor and I.C. Wright: "Gentlemen: You will recall that on 20 February, 1933, we and the representatives of the Brunswick County commissioners and board of education delivered to you checks on New York totaling $57,035 to be collected and held on special deposit, in trust, until we could settle with the board of county commissioners and the board of education and receive our shares of that money.
When the items were so handled it was anticipated that the settlement of the interested parties would be completed by this time. Such settlement not having been made, you are hereby so advised and notified to continue to hold separate, on special deposit, in trust, those funds until we get our part of them and so advise you." *Page 140 
Plaintiffs offer in evidence assignment, dated 19 March, 1933, amount $1,100, signed I.C. Wright, produced by defendants under notice, reading as follows: "$1,100. I hereby transfer and assign to the North Carolina Bank and Trust Company, as collateral security to my note of this date for that amount, eleven hundred dollars ($1,100) of the special deposit held in trust by the North Carolina Bank and Trust Company in the name of the Peoples United Bank of Southport, for $57,035, more than that part of the fund belonging to me. This 13 March, 1933. I.C. Wright."
Plaintiffs offer in evidence letter from M. F. Allen to Peoples United Bank, dated 21 March, 1933, as follows:
"North Carolina Bank and Trust Company
Wilmington, N.C. 21 March, 1933.
Peoples United Bank, Southport, N.C. Gentlemen:
We don't think we had the right to charge against special account set up in your name a part of the currency we shipped you on 3 March, amounting to $3,802.40. We are, therefore, charging your regular account with this amount and crediting the same back to the special account, restoring same to its original figures.
Trusting this meets with your approval, we are
Yours truly, M. F. Allen, cashier."
I.C. Wright testified: "I had a conversation with Mr. Yates, in which he said: `I want the Brunswick folks to have that money, and hope that they will get it, for it certainly was a special account for a specific purpose.' This conversation took place when I went down to see if that money had been put in a special fund, if the cash had been segregated in the bank records."
The affidavit of I.C. Wright as corroborative of his testimony on the trial, was in part: "And on that arrangement the checks were endorsed and turned over to Mr. Yates for collection, and he was to hold the money in a special deposit and for this specific purpose of being apportioned out as we agreed with the commissioners and board of education. I left and came back to my office."
The defendants contend: "The principal questions in this case concern: (a) The refusal of the court to grant the defendant's motion of nonsuit and (b) the action of the court in peremptorily instructing the jury to answer the issue in favor of the plaintiffs. Therefore, the exceptions relating to the admission of evidence are principally material as they reflect upon these two principal questions." *Page 141 
As to the admission of the letter and the declarations of M. F. Allen, cashier of the North Carolina Bank and Trust Company (Wilmington unit) to witness L. T. Yaskell we think competent.
In Pangle v. Appalachian Hall, 190 N.C. 833 (834): "The authorities in this State are all to the effect that what an agent says, relative to an act then being done by him within the scope of his agency, is admissible as a part of the res gestae, and may be offered in evidence, either for or against the principal; but what the agent says afterwards, and merely narrative of a past occurrence, though his agency may continue as to other matters, or generally, is only hearsay and not competent as against the principal. Johnson v. Ins. Co., 172 N.C. 142; Southerland v. R. R.,106 N.C. 100." We think that this evidence is dum fervet opus.
"So too, if the declaration or admissions, though relating to something that is in mere point of time passed, yet have for any reason a present interest and weight, or from any combination of circumstances assume a still subsisting importance, they will then be admissible as constituting a part of the res gestae, without regard to the fact that the precise act itself to which they relate was strictly speaking, concluded some time before." Morse on Banks and Banking, 6th ed., Vol. 1, pp. 286-287.
It is at least corroborative. The letter M. F. Allen testified to was written at Yates' request. Under the facts and circumstances of this case, we think the evidence admissible.
The real controversy in this case: was the charge of the court below correct? "Gentlemen of the jury, if you find the facts to be as testified to by all of the witnesses it would be your duty to answer the issue Yes." We think so.
In McIntosh, N.C. Practice and Procedure on page 632, we find: "If the evidence is all one way, and there is no conflict, the judge may say to the jury that, if they believe the evidence, they may find a certain verdict, but he cannot direct them that they must so find from the evidence. If the facts are admitted or established, and only one inference can be drawn from them, the judge may draw the inference and so direct the jury; but when the facts are not admitted, or more than one inference may be drawn, the case must be left to the jury to determine, with proper instructions from the judge as to the law. `A verdict can never be directed in favor of a plaintiff when there is any evidence from which the jury may find contrary to the plaintiff's contention, or where there is evidence which will justify an inference contrary to such contention.'" Bank v. Noble,203 N.C. 300 (302).
The well established principle in this jurisdiction is thus stated inCorporation Commission v. Trust Co., 193 N.C. 696 (699): "A deposit for a specific purpose is made when money or property is delivered *Page 142 
to a bank to be applied to a designated object, or for a purpose which is particularly defined, as, for example, the payment by the bank of a specified debt. It is neither general nor wholly special. It partakes of the nature of a special deposit to the extent that the title remains in the depositor, and does not pass to the bank. The consequence is that the money, if not applied, or if misapplied, may be recovered as a trust deposit. 7 C.J., 631; 1 Morse, Banks and Banking, sec. 185. In Morton v.Woolery, 24 A.L.R., 1107, it is said: `Where money is deposited for a special purpose as, for instance, in this case, where it was deposited for the stated purpose of meeting certain checks to be thereafter drawn against such deposit, the deposit does not become a general one, but the bank, upon accepting the deposit, becomes bound by the conditions imposed, and, if it fails to apply the money at all, or misapplies it, it can be recovered as a trust deposit.'" Citing a wealth of authorities. Corporation Commission v.Trust Co., 194 N.C. 125. In Flack v. Hood, Comr., 204 N.C. 337 (340), speaking to the subject: "But where deposits are made with the distinct understanding that they are to be held by the bank for the purpose of furthering a transaction between the depositor and a third person, or where they are made under such circumstances as give rise to a necessary implication that they are made for such a purpose, the deposits become impressed with a trust which entitles the depositor to a preference over the general creditors of the bank in case the bank becomes insolvent while holding the deposits. Corp. Com. v. Trust Co., supra; Hudspeth v. UnionTrust Savings Bank, 196 Iowa 706, 195 N.W. 378, 31 A.L.R., 466, and note; 7 C.J., 631." Lawrence v. Hood. Comr., 205 N.C. 268.
We do not think that there was such a material conflict in the testimony of plaintiffs' witnesses and defendants that would impinge the charge of the court below. The letter of 7 March, 1933, by Bryan and Campbell and others "to be collected and held on special deposit in trust," et cetera. No answer was made to this letter. Mr. Grainger, vice-chairman of the board of North Carolina Bank and Trust Company testified: "I have not copy of any answer in the file of the North Carolina Bank. It is the usual custom to make duplicate copies of letters. I did not tell any of the plaintiffs that I thought they ought to have this money. I told Mr. Wright on yesterday that the only interest we had was to find out legally to whom it belonged."
The assignment of I.C. Wright to secure a loan in which it was stated "to be collected and held on special deposit in trust" was a circumstance and competent. The testimony of J. W. Yates, vice-president of North Carolina Bank and Trust Company (Wilmington unit) in part was as follows: "They stated further that this money was to settle these suits and that the lawyers present had an interest in the amount, *Page 143 
in the way of fees, the amount of which had not been decided, but which would be decided in a short time, and they wanted the proceeds of these checks to be kept and credited in a separate and distinct account from the regular and general account of the Peoples United Bank. The Peoples United Bank was carrying at that time a general account with us. It was their wish that these funds be kept and credited in a separate account from the regular account. I suggested that the checks be forwarded for collection and when they had been collected and the bank had been so advised, the amount be credited to the Peoples Bank of Southport, special account, and they all agreed that was satisfactory, and upon that basis, I took these checks."
The receipts given afterward to Mintz and Sentelle read in part: "When collected, the proceeds of this check are to be credited to the Peoples United Bank of Southport in a special account." This read in connection with Mr. Yates' agreement, indicated that the special account was for a specific purpose.
The evidence instead of contradicting can be construed as corroborating plaintiffs' evidence. The checks were to be collected, the proceeds were not to be put in the "regular and general account," but a "special account," in other words, intact, indicating a "trust quality" and more correctly stated in plaintiffs' evidence "special deposit in trust." The evidence on the entire record was sufficient to show that the checks were put in the bank to be collected and held as "special deposit in trust." The testimony of I.C. Wright was that Mr. Yates said: "I want the Brunswick folks to have that money and hope that they will get it, for it certainly was a special account for a specific purpose." Mr. Yates in his testimony said: "I never made the statement to Mr. Wright that this was a special deposit, but stated that it was a special account."
The evidence, termed conflicting by defendants, we think it can be said on this record, is a distinction without a difference. All the facts and circumstances show that the drafts were to be collected and to be held as a special deposit and trust fund and the conclusion of Mr. Yates that it was a special account did not make it so, as the facts of the agreement — as stated by other witnesses and Mr. Yates himself, showed to the contrary. If a conflict, it is not a material one. The evidence all was to the effect that plaintiffs, knowing the shaky condition of banks at that period, took every precaution to protect their clients and themselves in insisting that when the bank collected the drafts they were impressed with a "trust quality." We do not think there is prejudicial or reversible error on the record. The exceptions and assignments of error made by defendants cannot be sustained. For the reasons given, in the judgment of the court below we find.
No error. *Page 144